Judge Chigueras and I are joined by audio conference by Judge Barry. Judge Barry, are you on there? Yes, I am. Good afternoon. Good afternoon, gentlemen. Good afternoon. And with that, we will call our case, the case of Francis X. Cheney II v. Daily News LP, Mr. Gosley. May it please the Court, I want to reserve about two minutes for rebuttal. You would like two minutes for rebuttal? Two minutes. I'll ask you to keep that microphone up there so not only we can hear you, but Judge Barry can hear you. It's a little loose, but I'll do my best, Your Honor. Okay. Thank you. Francis Cheney is a private citizen. He's been a member in good standing of the Philadelphia Fire Department for over a decade. He's never sought public office. He's never sought publicity. He's never sought the limelight. I think like a lot of people, he does his job, he works hard, and he worked hard to earn a good reputation. Now, the square issue before this Court is whether the use of Mr. Cheney's photograph, and more specifically his name, in connection with a sex scandal, which he had absolutely nothing to do with, can give rise to a claim of defamation and false light. But I do think, intended or not, there's now a broader issue, and I think that broader issue is whether news organizations can use the photograph and name of a private citizen without their consent, under any manner of headline, salacious or not, so long as that photograph can be considered a stock photograph. Well, Counsel, you know... Mr. Goffley, your complaint and both of your briefs invoke a January 29th article with a photograph identifying Mr. Cheney by name directly under, as you describe it, a salacious headline about a sex scandal in the Philadelphia Fire Department, and above, directly above the text of the article. Am I correct in concluding, as the Daily News suggests, and in footnote one of its brief to us, and Judge Dalzell's footnote three suggests, that the January 29th article, in its original form, now that's the word the news uses, is no longer available on the website, the Daily News website, and that all we can look at is an archived copy from a third-party website, which looks very different, at least to me. Now, that's a good question for you, so don't view it the wrong way. I'll do my best, Your Honor. I would agree that you can no longer directly access this specific article. There's nothing in the record that shows the first form of the January 29th article. That's right, Your Honor. Except your complaint and reasonable allegations to be drawn therefrom. That's right, and we did our best, as the arguments went along, to get an archived copy, but we do not have the original, how it appeared in the original form. That's correct. Mr. Gossely, while we're on that subject, the article of which you complain only appeared on the website. That's right. It only appeared in the printed version of the New York Daily News. That's right, Your Honor. And does the record indicate how long it was up on the website? The record does not indicate that. Well, Your Honor, I'm not exactly sure. Does your complaint indicate how long it was up on the website? The complaint does not directly say how long it was up on the website. To be fair, I will say that my client did eventually call and make a complaint, as well as another person in the fire department, and it was removed from the website. In what period of time? I think it was a few days, Your Honor. Well, I question that, Mr., because as I read it, there was a complaint made before January 30th, and after January 30th, only the archival, or whatever the word you younger people use, that's the only copy that was left. And you allege that that was because of the complaint that your client had made. Right. That's correct, Your Honor. And I don't know the specific dates of the complaints. But the next day it didn't appear. And the next day, the article with the photograph directly under the headline was no longer in the Daily News, and you allege in the complaint that was before, that was after your client's complaint. The client made a complaint after the articles. I think, Your Honor, it was not on the 29th that complaint made. I think it was made a few days after the original article. Right. At that point, my understanding is that there was no, there was no, it was gone. Well, that's a different article, Your Honor. There are two specific articles. I know. I'm talking about the archival article, vis-a-vis the one in its original form. No, Your Honor, I think we are talking about two different things. There are actually two substantively different articles. The first article appeared on January 29th. Yes, I understand that. Okay. But the photo, it was in a very different form on the 30th than it was on the 29th. You're talking about the original January 29th article. The one you complain of in your complaint. If the question is, Your Honor, when that photograph and when that article became inaccessible, the truth of the matter is I can't stand before this Court and say specifically when that happened. I know within a few days of the article appearing, a complaint was made and was taken from the website. I honestly cannot tell you this exact time frame. I know it was up for at least a day. I think it was up for at least two. But without discovery, I cannot stand here and tell you exactly. I suppose it would be impossible to answer at this point how many hits it got, right? I wouldn't know, Your Honor. Okay. Is this also when they took it down, I was a little confused about it, and there was some dispute in the briefs about an admission that was made. Are you saying it was an admission that they took it off? No, no, and I, this was not attached to the complaint, so I was somewhat reluctant to get into a specific argument. We actually do have an email from, I believe, the woman who drafted the article, the author, who specifically said, by placing your photograph here, it does, and I don't want to be misquoted, something along the lines of it does implicate you in the scandal, the placement of the photograph. Okay, but, again, it was not attached. It's not part of the record right now. It's not part of the record. Okay. All right. You know, many of the cases that are favorable to your position involves seemingly a more direct connection between the photograph and the article, like in Wallach and Morell. Here, nothing in the caption directly relates to the sexual assault investigation or allegations. Why should we treat those cases, the ones with a closer connection, why should we treat this case similarly to those cases? That's a good question, and my first response would be that I don't, especially with respect to Wallace, I don't necessarily agree that it's a stronger case. I think it's fundamentally a weaker case for definition. I'm talking about a more direct connection between the photograph and the article. So, you know, from my perspective, and I think from most readers' perspective, the whole purpose of having a photograph attached to an article is to communicate additional information, and there's almost necessarily an expectation that there's going to be an association between what's in the photograph and what's in the article, and in this case, obviously the photograph, this isn't a photograph of the fire commissioner, right? We're talking about a rank-and-file firefighter. It's a photograph in his name. The article is about a sex scandal involving firefighters, unbecoming conduct of regular firefighters, and the photograph is of a regular Philadelphia firefighter, not the head, not the apex of the organization, just a rank-and-file, and I think, Your Honor, respectfully, most reasonable readers, or at least some reasonable readers would make a link between why is this photograph of this random, low-level firefighter highly respected, but he's rank-and-file? Well, it seems to me to make a difference whether, as you say in your complaint, the photograph was directly under the headline and just before the text, or whether it's in this two-column archival article over to the side or wherever it is. Well, Your Honor, whether, I mean, the archival copy that I'm looking at that I believe we attached to it. Page 89, you mean page 89? That's right. There's a headline, and below that headline are the two photographs. Yes. And then next to that is the body of the article. Okay. All right. And I will say this also. I mean, this is from an archival from a desktop publication. I don't know how this looked on the mobile site either, and frankly I think a lot of folks, me included, consume most of my online media via my iPad or iPhone. I was saying, Your Honor, with respect to the – and I would like to point out the Wallace case, which as you know was a gentleman convicted of beating his mother to death. There was another article about a different murder, and that murder had to deal with a man named Simon. The photograph, though, was of Wallace, and underneath that they wrote Simon, right? And I say I think that's a weaker case because for individuals who don't know who Mr. Wallace is, they saw that photograph, they think it's Mr. Simon, and people who know Mr. Wallace would say, well, clearly they have the wrong picture here because the article is about Simon and it says Simon under the caption, but clearly there's something wrong. But I think that's not the case here. I think when you're talking about an article that says firefighters were involved in a sex scandal and you put a connection with that article of rank and file firefighter, his photograph and his name, I think that people will make that association. And I also will say, Your Honors, and I get the law in Pennsylvania here is that you make a threshold determination as a defamation, but there's a little bit of a disconnect with that standard because Mr. Cheney learned about this photograph when folks contacted him and said, were you involved in this sex scandal? And now on two occasions I've gone back to him and said, well, we lost in court because the judges concluded that no reasonable person would have reached that same conclusion. And I say that not in any sense to be critical, but just to say that there's a disconnect between how this is looked at in a vacuum and how the general community, at least members of the general community, did view this. I understand what you're saying. You've got to look at all the circumstances. But is this something, it's a little confusing, I think, the standard. Is this something like almost summary judgment where if there's no doubt you grant summary judgment, if not you pass it along to the jury? I think that's right, Your Honor. I think that what you are deciding, you are somewhat of a gatekeeper for, I think, because of First Amendment reasons, but you're still, the analysis is here, is whether a reasonable reader can do it. You're not drawing inferences in favor of it. But is not reasonableness a question of fact? And is this not a motion to dismiss? It's not a motion for summary judgment. It's a motion to dismiss. It is a motion to dismiss, and you're right. It's not summary judgment. But I think that when you're being asked the question as judges, and it's difficult because you're looking at this on paper, to decide what a reasonable reader could conclude. And so, to an extent, there is an element of summary judgment here. But isn't that a question of fact? I think it is a question of fact, Your Honor. But you said in your paper it was a question of law. Well, it's a question of law, and this is why it's a little confusing, because the law in Pennsylvania does say, and I'm sure Mr. Berry will discuss this when he stands up, that judges do make this threshold determination. Whether or not it could be considered defamatory and concerning an individual. What is defamatory is likely a question of law. But whether it's reasonable that it would be understood as defamatory may well be a question of fact. I would ultimately agree, certainly under the facts of this case, Your Honor. Let's assume that Mr. Cheney's name did not appear on the photograph. Would you be here? That's a good question. I don't know. And to answer the question, I don't think that I would, Your Honor. I think only because of the angle of the photograph. I think it would make it more difficult to see who it was. When you look at the writing, which is defamatory, we have to look here at the article. We have to look at the picture. And we have to look at any subtitles that may be related to the picture. I think that's right. I think that's certainly in the facts of this case with a very side profile view of the face. What about your third claim, the intentional infliction of emotional distress claim? I think that the issue, as I understand it, from the district court and the appellate court, was whether or not the allegations contained in the articles can be considered outrageous enough. And if that's the issue, I would argue that it would, at least for purposes of a motion to dismiss. I mean, if you think about how ostracizing it is to be accused of a sexual crime, or even if it's not a crime, some sort of inappropriate sexual conduct, that's very ostracizing to a person. It's certainly ostracizing and upsetting to Mr. Chaney, and I think most of us would react that way. Is it extreme or outrageous under Pennsylvania law, though? I think it is. I think, and to be fair, Your Honor, I have not found a case on point, but there are cases involving sexual misconduct with children that were deemed outrageous enough. And I think at this point, any kind of sexual misconduct, whether it's a child or an adult, would be sufficiently outrageous. Would you agree that recklessness has to be a standard that's lower than extreme and outrageous? Would I agree that recklessness, well, recklessness goes to intent, Your Honor. The extreme and outrageous is the nature of the defamatory material. Would I assume, so I'm not sure I understand the question. Okay. It may not be well, I mean, you're right that extreme and outrageous does go to intent, but I'm trying to look at the level of culpability here. I would agree that there needs to be some reckless conduct. And I think that at this stage of the pleadings, we've alleged that. I mean, this isn't a case where I think the author had some information that Mr. Chaney was somewhat involved and didn't do a thorough investigation, which could be negligence. This is, if we agree for purposes of this point that this is defamatory material and it applies to Mr. Chaney, then I think just randomly picking a firefighter, putting his name and photograph on top of an article about a sexual misconduct, having absolutely no evidence or reference, I think that that could go to a level of recklessness, Your Honor. Okay. All right, Mr. Gassi, we'll have you back on rebuttal. Thank you, Your Honor. Mr. Berry? May I please have the court? Good afternoon. My name is Mike Berry. I represent the Daily News. This panel got it exactly right the first time around. Mr. Chaney failed to state a claim as a matter of law because the Daily News article that's at issue here is simply not capable of being reasonably understood as intending to report that he was involved in the sex scandal. The issue is not some other publication or some sort of parade of horribles about what might be in other publications with different people in different photographs in different circumstances. Every publication is different, but the law remains the same and has remained the same for generations. The single question here is whether this photograph, this caption, in the context of this particular article, can be reasonably understood to intend that Mr. Chaney was implicated in the sex scandal. And as you all held the first time around, it simply cannot be. It's a fairly high bar you've got to meet, right? I mean, basically, is it incapable of a defamatory meaning, no matter how you look at it? I'm concerned about the standard here because a lot of the cases that are cited by the parties, Fogel and Morrell, are decided at the summary judgment stage. We're at the motion to dismiss stage right now. So we've got to make a determination as to whether it's capable in any way of a defamatory meaning. So we've got to be sure about that before we render a final decision on that point. This is utterly incapable of defamatory meaning? Of reasonably conveying the intent of the Daily News to say that Mr. Chaney was the one implicated. I can't speak as to why Morrell or Fogel or some of these other cases were decided on summary judgment as opposed to on a motion to dismiss, but the analysis that those courts engaged in was the same sort of legal analysis that's put before you on a motion to dismiss. For generations in Pennsylvania and here in the Third Circuit, it's a question, a pure question of law in the first instance, whether an article can be reasonably capable to be understood as the plaintiff alleges. We've cited a number of cases in our brief, Wedko and Jenkins and other cases, where that's decided as a matter of law. In both Morrell and in Fogel, the question before the court and the analysis that the courts went through in those cases, the same that the court went through in Wallace, was looking at the face of the article, at the publication itself, considering all of its aspects in context, is it capable of the defamatory meaning alleged? In Morrell, the court looked and it said, here's an article about organized crime in the fishing industry. We have two photographs, one of a man named Socks Lanza, who's identified as being a mobster in the fishing industry. Another photograph of a fisherman with a caption underneath there saying, small fry in a fishy business. The implication with both of those articles in an article, sorry, of both of those photographs with those captions in the context of a larger article about organized crime, is that this fellow, the small fry, is engaged in a fishy business. What's the difference between what you're talking about in this case? If you look at the allegations of the complaint, where you have this article and directly under the salacious headline and just before the text of the article begins, you've got Mr. Cheney's picture identified by name. Why is it not a reason, why could not a reasonable viewer have not come to the conclusion that this was defamatory or false light or whatever usage or correct word or iteration or reasonableness would be? Your Honor, you're asking a very good question, and I think there's two parts to the answer. The first part of that answer is the first question that you asked to Mr. Gosley, which goes to the nature of the article that's at issue. Allegations that are in the complaint are just those, they're allegations. Well, yeah, but this is a motion to dismiss, and the allegations are deemed to be true at all reasonable inferences therefrom. That's exactly right. The issue is do those allegations match what the actual article was? We don't have a copy of the original article. It's extant in Judge Dalzell's word. That is correct, except for that the plaintiff, in response to our motion to dismiss, submitted a copy of the article that he claims was the copy that was posted online. I don't know. I think that's the archival, but I don't know anything about archival, internet or anything. It seems to me that there is no extant copy, that was the word I believe Judge Dalzell used, of the article, the article with the picture directly under the headline. Your Honor, I believe that when the plaintiff submitted the copy of the article, in response to our motion to dismiss, he represented that this was the article at issue. His allegations in the complaint, his description of the article, don't match the document he submitted. Well, what about your declaration? Your footnote one in your brief, where you're talking about there really isn't an article and it's no longer available on the Daily News website and this archival copy is the best that can be done. I mean, I don't know. I assume that was two different articles. Maybe I'm wrong. We submitted, I believe, with the declaration, the existing copy of the article as it appears online, with a copy of the photograph that we understood was posted with the story at that time. Mr. Chaney, after we did that, submitted his own copy and said this is the article that I'm suing on. The court properly relied on that article and this court can consider it just as Judge Dalziel did. This is the plaintiff's representation of what he is suing on in response to our motion to dismiss. It's the equivalent of somebody putting forward in a contract case and saying, you know, this is the contract. What do its terms mean? That's the same thing that's happened here. He has submitted a copy of the article. And I would note that on the article it's dated January 30th, 2015, on when this was printed. And so if there was some sort of issue, Mr. Chaney would have known that the day after the article appeared. Again, I'm pointing to JA 89 and 90 in the record. Counsel, do you agree that, according to your information, there's no link between the sex scandal and Mr. Chaney? For this purpose, we have to assume that that's true and take it as well pled that that's the case. If I could just continue with response to Judge Barry. The second thing is that Mr. Chaney has not contested on appeal that the article that he submitted in response to our motion to dismiss was not the article that's issued. That was never raised in his brief on appeal. He has consistently said that this is the article that I'm suing on, the one at JA 89 to 90. And he has never said otherwise, both in the district court nor in this court. The second part of my answer to Judge Barry's question about the reference to Mr. Chaney in this article is that you have to, again, his allegations may be one thing, but there's legions of Pennsylvania cases that we've cited in our papers, both the Third Circuit and in Pennsylvania, saying that the plaintiff may offer one construction of an article, but the court needs to consider whether that's reasonable. And in doing that, must look at the entire context of the publication, not simply the photograph and the fact that his name is used, but you have to look at it all. But isn't innuendo also actionable? I mean, it doesn't necessarily have to have his name specifically, but if it's innuendo, isn't that also going to be actionable under Pennsylvania law? Absolutely, but the standard is the same, that he has to establish that it can be reasonably understood that the daily news intended to convey that implication. That's what the Harris Easton publishing case says. That's what Dunlap says. That's what Livingston says. What does reasonably understood mean? Is reasonably understood the same as no reasonable person would understand it? I guess you could phrase it that way. It must be reasonably capable. Well, that goes back to my question. Isn't reasonable a question of fact? No, under well-established Third Circuit and Pennsylvania law, it's a pure question of law. There's two inquiries under Pennsylvania law with other concerning. The first question is, is there an application to the defendant? Or, as the Harris case says, is it reasonably capable of being understood as intended to refer to this person? The second question is a question of fact, which is, if it's so reasonable, did anyone actually understand it that way? That's the same standard that's applied in the restatement, I believe, in Section 564, is adopted and codified in Pennsylvania. Going back to the actual article in question, you have to look at all elements. This is an article about a sex scandal. The headline refers to the fire department as a whole. The text of the article refers to dozens of employees. It doesn't mention Mr. Cheney at all. There's nothing to suggest from the text of the article that he's personally involved. You then look at the layout of the article. There's nothing to suggest from the layout that he was personally involved. In the version that he submitted, that Judge Dozell considered on the motion to dismiss, you have a slideshow with two photographs. Both of them are generic, positive portrayals of a fire department. The first image is the one of a firefighter in Coatesville in 2009 with the description of just that, a Philadelphia firefighter in Coatesville in 2009. The second photo is the photo of Mr. Cheney. It's only visible with the caption if clicked upon. The first photo provides context for that second photo, the one of Mr. Cheney. Well, wouldn't that go to damages? It wouldn't go to whether or not it could be understood, reasonably understood. Maybe the damages would be less if, indeed, if the second thumbnail was of Mr. Cheney as opposed to having a big picture of him under there. Do I? It could go to damages, Judge Berry, but I believe that in the first instance it goes to whether the implication that he's alleged is reasonable. And here, his is the second photograph. It's a photo of an emblem on the side of his uniform, not of his face, and the caption explains accurately that it is of him at the 9-11 ceremony back in 2006. In the context with the other photo that shows an unnamed firefighter at a fire in 2009, of this whole article, the only reasonable implication is that these photos are being used as emblematic of the fire department in general. This case is not like Wallace or Peck or even Murrell, where you have an actual forward-facing face of somebody. If the Daily News had wanted to identify Mr. Cheney as a suspect, it would have used a mugshot like Wallace, or it would have used a forward-facing official photo as in Peck. But they didn't. He's not implicated.  There's no suggestion he was implicated in the scandal, and this is the possible implicit suggestion that he was. That's the case, isn't it? Your Honor, we would respectfully disagree. We believe that the way that the photo is used within the context of this publication  In the Fogel case, there was a photograph of people at a counter in Miami flying to Latin America with a ton of boxes by them in an article that was about people buying goods in Miami and then selling them at higher prices in Latin America, and the court held that that was not reasonably capable of conveying that those folks were involved. And there you had, just like in Murrell, a caption that tied those people to the particular article. Here we don't even have that. We have Mr. Cheney's name, but talking about circumstances that were different than the sex scandal. We didn't say, Mr. Cheney, a firefighter implicated in this sex scandal. We said, Mr. Cheney here raising a flag at a September 11th ceremony in 2006. If the record showed that Cheney showed this document to six of his friends the next day, three of them said that the article in the photograph suggests that he was involved, and three of them said, oh, that doesn't mean anything. It was just a photograph of you in 2006. Does that mean that a reasonable reader found that the document in the article defamed Cheney? No, and the law is quite clear on that. If not, why not? Well, again, there's two separate inquiries. The first is the legal inquiry of the reasonable meaning, and then whether people thought that. In the restatement, Section 564, Comment B, it says, quote, it is not enough that the defamatory matter actually be understood, as intended to refer to the plaintiff. The interpretation must be reasonable in light of all the circumstances. Yes, you see, it doesn't say reasonable, a reasonable defamatory statement, or whether it's reasonable. It says a defamatory statement, whether it is reasonable to a reader. You know, the defamation itself, whether it's defamatory is a matter of law. But we're talking about whether it would be reasonable for a reader, or whether a reasonable reader could find that it was. Right? Yes, Your Honor. Defamatory is not a question, was it reasonable or was it defamatory? That's not the question. That's a matter of law. I guess the best case that I can point to for this is the seminal case of New York Times v. Sullivan. That case went all the way to a jury, and a verdict was handed down against the New York Times in dealing with an advertisement that didn't name the plaintiff. At the trial in that case in Alabama, there were six different witnesses who came up and said, I read this advertisement, and I could have told you that was about Mr. Sullivan. And a verdict was rendered in Mr. Sullivan's favor. The case went up to the United States Supreme Court. We generally follow that case for the actual malice standard, but the first part of that opinion talks about the other concerning issue and says, notwithstanding the fact that these six witnesses testified as they did to their understanding of the advertisement, as a matter of law, that understanding is not reasonable. The same is true here. Again, it's consistent exactly with the restatement, which does also cite that reasonableness standard. Thank you. All right, Mr. Berry, thank you very much. And we'll have Mr. Gosley back on rebuttal. Thank you, Your Honors. I just want to quickly address sort of where we left off here. And I think Mr. Berry has ably distinguished a lot of these cases from the case at hand. But the reality is, if you do look at the law, the question, although there is a place for the court obviously in determining whether an article can be of and concerning, at the end of the day, the inquiry is whether a reasonable reader could conclude that this article was about Francis Chain. And I said this when I first stood up, this disconnect that we have in this case, which is I believe that the evidence, if we go to discovery, will show that Mr. Chaney learned of this article because a number of individuals contacted him believing, having read the article, having seen the photograph, believing that he was one of the firefighters involved in the scan. Is that enough? I think that it is, Your Honor. I think at the end of the day, you know, with respect to what Mr. Berry was saying, if this gets past the motion to dismiss in summary judgment, it will be a jury question as to whether or not the defamatory content could be interpreted to be about my client. So I think it is enough, Your Honor. Otherwise, we wouldn't have bench trial for defamation cases. We would be trying these cases to judges. The other thing I'd like to just quickly point out is there was a question, a number of questions about where we are in this case. We are at the pleading stage, obviously. Now, there is case law, again, that says judges have a job, and that job is to make a determination as to whether or not defamatory content can be considered of and concerning a particular individual. That does not mean that the allegations in the complaint are ignored. And, again, the allegations that we plead and what I think we will prove is not only did other individuals believe that there was a link and association between Mr. Cheney's placement of Mr. Cheney's photograph, not as, you know, the commissioner of the fire department or rank-and-file firefighter and the content of the article, but I believe the evidence will ultimately show that the New York values admitted as well. Thank you. All right, Mr. Gosley. And we thank both counsel for an interesting case, a case that was before us before, and quite frankly it's one of those cases that maybe on second thought we determined maybe we should have heard argument to give you both a chance to get your comments added to your briefs. And having heard from you, we will now take the matter under advisement. Thank you. All right. Judge Berry, we'll give you a call.